**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| WILLIAM SAUNDERS, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-18-1746 |
| | § | |
| LINCOLN MANUFACTURING, INC., | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND OPINION**

William Saunders sued Lincoln Manufacturing, Inc., alleging that Lincoln failed to compensate him for overtime work as required by the Fair Labor Standards Act, 29 U.S.C. § 207(a)(2). Lincoln moved for summary judgment, arguing that because Saunders worked for Lincoln in an executive capacity, he was exempt from the FLSA's overtime pay requirement. 29 U.S.C. § 213(a)(1); (Docket Entry No. 16). Saunders responded, submitting declarations from individuals who worked under him, and Lincoln replied and moved to strike the declarations. (Docket Entry Nos. 17–18). After a careful review of the motions, responses, and replies; the record evidence; and the applicable law, the court grants in part and denies in part the motion to strike and grants summary judgment for Lincoln. Final judgment is separately entered. The reasons are explained in detail below.

I.  **Background**

Lincoln, based in Magnolia, Texas, manufactures products for the oil and gas industry. (Docket Entry No. 16-1 at 1). Lincoln has four manufacturing facilities, including one in Magnolia that fabricates couplings, pipe threading, and other components. (*Id.*). The Magnolia facility runs "continuously." (*Id.*). The day and night shifts have separate Production Supervisors who direct

operations during the shift. (*Id.*). Beneath the Production Supervisor are Inspectors, Machine Operators, Pipeyard Forklift Operators, Process Technicians, Saw Operators, Leadmen, and Janitors, for each shift. (*Id.*). The Production Supervisors report to the Plant Manager, who is the Magnolia Facility's final decisionmaker. (*Id.*).

In October 2015, Lincoln hired Saunders to be the night-shift Production Supervisor. (Docket Entry No. 16-2). His employment offer stated: "You will be classified as an exempt employee. Your initial compensation package includes an annual salary of $60,000 ($1153.85 payable weekly on Fridays)." (*Id.*). After about a year, Lincoln increased Saunders's "to $63,120.20 per year, equating to approximately $1,213.85 per week." (Docket Entry No. 16-1 at 2). Saunders "earned more than the second shift employees that reported to him." (*Id.* at 3). "For example, the average Forklift Operator earned between $15.50 and $17.50 per hour." (*Id.*).

Saunders directed the night-shift production at the Magnolia facility, working between 5:00 p.m. and 3:45 a.m. (Docket Entry No. 16-4 at 16–17). No one was "ranked higher" at the facility between those hours. (*Id.* at 17). Chris Ritter, the Magnolia Plant Manager, did not work night shifts. (*Id.* at 16). Saunders called Chris Ritter "[m]aybe seven or eight times" during night shifts to tell him about accidents or machines malfunctioning. (*Id.*). The only other night-shift supervisor was Oscar Gonzalez, a Quality Supervisor, who monitored "the inspectors and everything." (*Id.* at 17). Saunders considered himself equal in authority to Gonzalez, and they often discussed "problems and stuff." (*Id.*). Saunders was responsible for setting the night-shift schedule. (*Id.* at 17–18). He would get to work early to "see what was happening, what was running, what [he] needed to do," given that "[t]here wasn't really a set schedule." (*Id.* at 18).

Saunders understood his "main job" as supervising the night shift. (*Id.* at 9). Saunders

initially supervised "around 15" employees, but over time he supervised "close to 60." (*Id.* at 13). Saunders described his duties as "to manage the floor, make sure machines were running, to make sure the employees were working safe, to oversee things." (*Id.*). He would "[w]alk around, make sure all the machines were running, check, make sure they got the proper heats at the machines . . . . [,] make sure that it was the right size that they were supposed to have been running." (*Id.* at 14). Saunders made sure that employees "weren't out goofing off" and "helped set up machines in some cases." (*Id.*). According to Saunders, "I wasn't there to let them do whatever they wanted to do. . . . I was there to supervise." (*Id.* at 22).

Saunders spent "probably 85 to 90 percent of [his] day walking around making sure everything was running properly." (*Id.* at 23). If employees made mistakes, Saunders "would spend time there with them, try[ing] to go over things." (*Id.* at 24). At the beginning of each night shift, Saunders held a safety meeting for "10 or 15 minutes," to "go over safe start, balance, traction, grip, find the fire, lifting things, pinching points[, the] whole works, to make sure [that the employees were] working properly." (*Id.* at 23). Saunders gave his employees the night-shift schedule after the safety instructions. (*Id.*). His supervisory duties included getting orders completed, "processed[,] and ready to go." (*Id.* at 17). To make sure their orders were shipped on time, Saunders "stayed on the floor . . . and made sure all the machines were running, monitored people, making sure they were hitting their quota." (*Id.*).

Saunders could "write up" employees for violating Lincoln policies. (*Id.* at 14). "Writing up" required Saunders to complete and sign a form and send it to the "front office for approval." (*Id.* at 14, 23). If employees wanted time off, had to come in late, or needed to see a doctor, they went to Saunders, who would fill out and sign a form to send to Human Resources "for approval."

(*Id.* at 15, 23).  Employees went to Saunders other requests as well, such as transfer requests, which he would sign off on and forward to Human Resources.  (*Id.* at 18–20).  During his time at Lincoln, Saunders recommended that the company hire "a couple of guys."  (*Id.* at 15).  Lincoln interviewed these candidates; but Saunders was not involved.  (*Id.*).  Saunders was responsible for approving employees' time cards, including for overtime.  (*Id.* at 17, 20).  The cards were sent to Human Resources for approval.  (*Id.*).  Saunders dealt with and relayed employee complaints, submitted incident reports, and signed employee evaluations and pay raises.  (*Id.*).  Saunders could also recommend that Lincoln fire an employee.  (*Id.* at 20–21, 24).

Based on his pre-employment interview with Ritter, Saunders thought that he had to work 40 hours a week and that he would "get time off" if he worked overtime.  (*Id.* at 12).  Because the night shift was understaffed when Saunders began his employment, he "had to bring the parts in, move parts, empty hoppers, the whole works."  (*Id.* at 13).  Saunders "walked the floors, empt[ie]d hoppers, drove the forklift, moved parts, brought in parts, took parts to processing, managed the floor, made sure all the employees were working properly, ma[d]e sure nobody had problems."  (*Id.* at 16–17).  Even when Saunders was operating the forklift, he continued to monitor his employees "[t]he best [he] could."  (*Id.* at 17).  When Lincoln hired a forklift driver for the night shift, Saunders spent "more time on the floor monitoring people trying to improve their productivity."  (*Id.* at 26).

During his employment, Saunders complained "all the time" to Chris Ritter, the Magnolia Plant Manager, about "all the overtime [he] was working, and about the job duties [he] was having to perform."  (*Id.* at 8).

In March 2018, Lincoln fired Saunders, stating as the reason that he was "[u]nable to meet performance standards and expectations."  (Docket Entry No. 16-3).  Saunders's Employment

Termination Notice was signed by Chris Ritter and by Mabel Olivas, Lincoln's Human Resources Manager. (Docket Entry No. 16-1 at 2).

Saunders's complaint alleged that Lincoln misclassified him as exempt because "[h]is duties did not differ materially from those whom he supervised." (Docket Entry No. 1 at 2–3). The complaint alleged that he lacked the "authority to hire or fire" and "discretion or independent judgment . . . as to matters of overarching importance to the business." (*Id.* at 3). The complaint alleged that he "operated equipment and machinery like the employees who were supposedly his subordinates, but who in fact made more money than Saunders doing the same work he did—because they were paid overtime." (*Id.*).

The discovery that followed included Saunders's deposition, in which he testified as follows:

> I'm pretty much upset because I—for the past two and a half years when I was at Lincoln all I done [was] work and sleep, work and sleep. And everybody else was doing the same, you know, working, running machines and stuff, making more than I was. And I was even having to drive the forklift, empty hoppers. I done that over a year. I kept asking for help and never got it until after a year and a half. . . . I constantly complained about not having a maintenance man or nothing else. On day shift they had several forklift drivers. They had all the maintenance people. On night shift we didn't have nothing. I didn't have nothing.

(Docket Entry No. 16-4 at 8). Saunders finally contacted a lawyer to "see if [he] can get compensated for all the, the things that [he did that he] really shouldn't of had—have to do." (*Id.* at 9).

Lincoln moved for summary judgment, arguing that Saunders worked in an executive capacity and was not entitled to overtime pay. (Docket Entry No. 16). Lincoln points to a declaration from Lincoln's Human Resources Manager, Saunders's deposition, and two emails that Saunders sent, arguing that the undisputed facts shown by the record support that, as a matter of law, Saunders's primary duty was management and that his recommendations about employees were

given particular weight. (*Id.* at 14–20). Lincoln contends that Saunders has not identified any properly considered evidence showing factual disputes material to these issues. (*Id.*).

Saunders responded by submitting declarations from two people who worked under him on the night shift. He argued that those declarations and his deposition support a reasonable inference that he "spent most of his time driving a forklift, loading hoppers, and operating machinery," work that is not managerial. (Docket Entry No. 17 at 2). Saunders argues that he had no "say in hiring, firing, discipline, or such other managerial responsibilities," and that the employees who worked under him "made more money than he did, when accounting for their overtime pay." (*Id.*). Saunders's point is that the primary-duty issue presents "a hotly disputed issue of material fact" that precludes summary judgment. (*Id.*).

Lincoln replied and moved to strike parts of the declarations Saunders submitted. (Docket Entry No. 18). Lincoln identifies statements that it argues are speculative, conclusory, and contradict statements in Saunders's earlier deposition. (*Id.* at 2–4). Lincoln also argues that even if these statements are considered, they do not support a reasonable inference that Saunders's primary duty was not management, or that his recommendations as to employee status were not given weight. (*Id.* at 5–10). Lincoln argues that even considering the declarations in their entirety, the undisputed facts show that, as a matter of law, it properly classified Saunders as exempt. (*Id.*).

Saunders responded to the motion to strike, contending that the individuals' statements were based on the declarants' personal observations of the Magnolia facility night shift. (Docket Entry No. 20 at 1–2). Saunders argues that the statements were neither conclusory nor inconsistent with his deposition testimony. (*Id.*).

Lincoln argues that Saunders has not carried his burden of showing that the declaration

statements are admissible. (Docket Entry No. 23 at 3–5).

The parties' arguments are considered in detail below.

## II. Legal Standards

### A. Summary Judgment

"Summary judgment is appropriate only if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Vann v. City of Southaven, Miss.*, 884 F.3d 307, 309 (5th Cir. 2018) (quotation omitted); *see also* FED. R. CIV. P. 56(a). "A genuine dispute of material fact exists when the 'evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Burrell v. Prudential Ins. Co. of Am.*, 820 F.3d 132, 136 (5th Cir. 2016) (quoting *Savant v. APM Terminals*, 776 F.3d 285, 288 (5th Cir. 2014)). The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of" the record "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

"Where the non-movant bears the burden of proof at trial, 'the movant may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating'" that "there is an issue of material fact warranting trial." *Kim v. Hospira, Inc.*, 709 F. App'x 287, 288 (5th Cir. 2018) (quoting *Nola Spice Designs, LLC v. Haydel Enters., Inc.*, 783 F.3d 527, 536 (5th Cir. 2015)). While the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case. *Austin v. Kroger Tex., L.P.*, 864 F.3d 326, 335 (5th Cir. 2017). A fact is material if "its resolution could affect the outcome of the action." *Aly v. City of Lake Jackson*, 605 F. App'x 260, 262 (5th Cir. 2015) (citing *Burrell v. Dr. Pepper/Seven UP Bottling Grp., Inc.*, 482 F.3d 408, 411 (5th Cir. 2007)). "If

the moving party fails to meet [its] initial burden, [the summary-judgment motion] must be denied, regardless of the nonmovant's response." *Pioneer Expl., LLC v. Steadfast Ins. Co.*, 767 F.3d 503, 511 (5th Cir. 2014) (quoting *Kee v. City of Rowlett, Tex.*, 247 F.3d 206, 210 (5th Cir. 2001)).

"When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings." *Duffie v. United States*, 600 F.3d 362, 371 (5th Cir. 2010). The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim. *Willis v. Cleco Corp.*, 749 F.3d 314, 317 (5th Cir. 2014). "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'" *Jurach v. Safety Vision, LLC*, 642 F. App'x 313, 317 (5th Cir. 2016) (quoting *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005)). In deciding a summary-judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205–06 (5th Cir. 2007).

**B.      Summary Judgment Evidence**

Under Federal Rule of Civil Procedure 56, the party "asserting that a fact cannot be or is genuinely disputed must support the assertion" by:

(A)   citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

(B)   showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

*Id.* 56(c)(1)(A)–(B). "A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." *Id.* 56(c)(2). "An affidavit or

declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." *Id.* 56(c)(4). The court must be able to "reasonably infer personal knowledge" from the declaration or affidavit itself. *Campbell Harrison & Dagley, L.L.P. v. PBL Multi-Strategy Fund, L.P.*, 744 F. App'x 192, 198 (5th Cir. 2018) (per curiam) (citing *DIRECTV, Inc. v. Budden*, 420 F.3d 521, 530 (5th Cir. 2005)).

The "evidence relied upon need not be presented in admissible form, but it must be '*capable of being presented in a form that would be admissible in evidence.*'" *D'Onofrio v. Vacation Publ'ns, Inc.*, 888 F.3d 197, 208 (5th Cir. 2018) (emphasis in original) (quoting *LSR Consulting, LLC v. Wells Fargo Bank, N.A.*, 835 F.3d 530, 534 (5th Cir. 2016)). This standard "allows the court to consider the evidence that would likely be admitted at trial—as summary judgment is trying to determine if the evidence admitted at trial would allow a jury to find in favor of the nonmovant—without imposing on parties the time and expense it takes to authenticate everything in the record." *Maurer v. Indep. Town*, 870 F.3d 380, 384 (5th Cir. 2017).

"Conclusional allegations and denials, speculation, and unsupported assertions are insufficient to avoid summary judgment." *Sanches v. Carrollton-Farmers Branch Indep. Sch. Dist.*, 647 F.3d 156, 165 (5th Cir. 2011); *see also Clark v. America's Favorite Chicken Co.*, 110 F.3d 295, 297 (5th Cir. 1997) ("Unsupported allegations or affidavit or deposition testimony setting forth ultimate or conclusory facts and conclusions of law are insufficient to defeat a motion for summary judgment."). "Neither legal conclusions nor statements made without personal knowledge are capable of being" presented in admissible form. *D'Onofrio*, 888 F.3d at 208.

## III.  Analysis

## A.     The Motion to Strike

Lincoln's motion to strike requires the court to decide whether the challenged statements in Jose Corona's and Lorenzo Henderson's declarations are "*capable* of being presented in a form that would be admissible in evidence.'" *Id.* at 208 (quotation omitted). "A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." FED. R. EVID. 602. Personal knowledge can be proven through "the witness's own testimony." *Id.* A witness may also give an opinion: (1) rationally based on the witness's perceptions; (2) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (3) not based on scientific, technical, or other specialized knowledge. *Id.* 701. "[G]enerally, doubts should be resolved in favor of admissibility." *United States. v. Cent. Gulf Lines, Inc.*, 974 F.2d 621, 625 (5th Cir. 1992). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 596 (1993).

Jose Corona stated in his declaration that while he was a CNC operator at Lincoln from January to May 2018, he "worked with William Saunders on a daily basis." (Docket Entry No. 17-1). Corona stated that:

> I did not see Saunders hire or fire employees. The only writeups I ever saw him do were for when people came in late, left early, or did not show up for work. There was a chart on the wall that showed how many "points" each of these cost, i.e., if you called in for no reason you got a point. If you got a certain number of points you got a writeup. Mr. Saunders signed off on these forms but that was about all the "discipline" or "management" type work that I ever saw him do.

(*Id.*). Lincoln objected to these statements as conclusory and unsubstantiated. (Docket Entry No. 18 at 2). This objection is overruled. The statements are based on Corona's personal observations

and knowledge as a Lincoln employee.

Corona stated that his "understanding of hiring and firing at [Lincoln] was that these decisions were made in [Human Resources]." (Docket Entry No. 17-1). Lincoln objected that the "declaration does not demonstrate that Mr. Corona has first-hand knowledge of [Lincoln's] personnel practices, nor does he claim to have any experience working in [Lincoln's] Human Resources department or in management." (Docket Entry No. 18 at 3). This objection is overruled because Corona's statement is based on the understanding gained from at least his own experience being hired and working for Lincoln.

Henderson's declaration stated that while he "was employed by Lincoln . . . in two stints around 2015–2016, as a machinist," he "worked with William Saunders on a day-to-day basis." (Docket Entry No. 17-2). Henderson stated that:

> I never saw Mr. Saunders write up or discipline any employees during my employment with Lincoln . . . . I never saw him involved in hiring, firing, or interviewing employees either. Those types of decisions, as I observed them, appeared to come from the plant manager or owner. Mr Saunders did not have a say in that.

(*Id.*). The first three sentences are admissible because they reflect Henderson's own observations of Saunders and of who made hiring, firing, and disciplinary decisions at Lincoln. Lincoln objects to the statement that "Saunders did not have a say" in these decisions, arguing that the declaration provided no "basis or foundation to support" that "conclusory assertion." (Docket Entry No. 18 at 3). The court sustains this objection, striking the fourth sentence, because there is no basis for finding that Henderson had personal knowledge of Saunders's influence on hiring, firing, or similar decisions.

Henderson also stated that he "saw Mr. Saunders load hoppers, clean up shavings from

machines, change out saw blades, and generally run the machines every day he was there. Most if not just about all of his time was spent doing this kind of hard, physical work." (Docket Entry No. 17-2). Lincoln objects to the second sentence because the declaration "does not indicate or even suggest that Henderson followed [Saunders] around each day at work, monitored [Saunders's] activities or otherwise tracked his movements." (Docket Entry No. 18 at 4). The court strikes the second sentence because the declaration does not provide a basis to find that Henderson observed Saunders on a sufficient basis to testify as to how Saunders used "most" or "all" of his working time.

Lincoln finally argues that the court should exclude Henderson's statements that contradict Saunders's "prior deposition testimony." (*Id.*). "It is well settled that this court does not allow a party to defeat a motion for summary judgment using an affidavit that impeaches, without explanation, sworn testimony." *Hackett v. United Parcel Serv.*, 736 F. App'x 444, 449 (5th Cir. 2018) (per curiam) (quoting *S.W.S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 495 (5th Cir. 1996)). But in "considering a motion for summary judgment, a district court must consider all the evidence before it and cannot disregard a party's affidavit merely because it conflicts to some degree with an earlier statement." *Winzer v. Kaufman Cty.*, 916 F.3d 464, 472 (5th Cir. 2019) (quotation omitted). "In light of the jury's role in resolving questions of credibility, a district court should not reject the contents of an affidavit even if it is at odds with statements made earlier." *Id.* (quotation omitted). "Under the sham affidavit doctrine, a district court may refuse to consider statements made in an affidavit that are 'so markedly inconsistent' with a prior statement as to 'constitute an obvious sham.'" *Id.* (quoting *Clark v. Resistoflex Co.*, 854 F.2d 762, 766 (5th Cir. 1988)); *see also Hackett*, 736 F. App'x at 449 ("[T]he district court may appropriately reject affidavits that contradict prior accounts—especially when no explanation for the conflict is offered.").

Lincoln has not identified statements in Henderson's declaration that "are so markedly inconsistent" with Saunders's deposition testimony "as to constitute an obvious sham." *Winzer*, 916 F.3d at 472 (quotation omitted). The court denies the motion to strike Henderson's statements on this ground.

**B.     The Motion for Summary Judgment**

The FLSA "requires an employer to compensate any covered employee who works in excess of 40 hours in a workweek 'at a rate not less than one and one-half times the employee's regular rate.'" *Dewan v. M-I, L.L.C.*, 858 F.3d 331, 333–34 (5th Cir. 2017) (alteration omitted) (quoting 29 U.S.C. § 207(a)(1)). "Though the FLSA establishes a general rule that employers must pay their employees overtime compensation, executive, administrative, and professional employees are exempt." *Moore v. Hannon Food Serv., Inc.*, 317 F.3d 489, 492 (5th Cir. 2003) (citing 29 U.S.C. § 213(a)(1)). Lincoln argues that the undisputed evidence shows that, as a matter of law, Saunders worked in "a bona fide executive . . . capacity" and was exempt from the overtime requirements. 29 U.S.C. § 213(a)(1)

The elements of an FLSA unpaid overtime claim are that: (1) an employer-employee relationship existed during the unpaid overtime periods claimed; (2) the employee engaged in activities within FLSA coverage; (3) the employer violated the FLSA's overtime wage requirement; and (4) the amount of overtime compensation due. *Johnson v. Heckmann Water Res. (CVR), Inc.*, 758 F.3d 627, 630 (5th Cir. 2014). "Once the employee establishes a prima facie case, the burden then shifts to the employer to 'come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence.'" *Id.* (quoting *Harvill v. Westward Comm'cns, L.L.C.*, 433 F.3d 428, 441 (5th Cir. 2005)).

"If the employer claims 'that the suing employee is exempt from the overtime requirement,' then the employer 'has the burden of proving that the employee falls within the claimed exempted category.'" *Id.* (quoting *Samson v. Apollo Res., Inc.*, 242 F.3d 629, 636 (5th Cir. 2001)).

To show that an employee works in a "bona fide executive . . . capacity" and was exempt from the FLSA's overtime requirement, 29 U.S.C. § 213(a)(1), the employer must prove by a preponderance of the evidence that the employee: (1) is compensated at least $455 per week; (2) has the "primary duty" of "management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof"; (3) "customarily and regularly directs the work of two or more other employees"; and (4) "has the authority to hire or fire other employees," meaning that his "suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees [were] given particular weight." 29 C.F.R. § 541.100; *see Chambers v. Sodexo, Inc.*, 510 F. App'x 336, 339 (5th Cir. 2014). "The executive exemption is conjunctive and accordingly, the employer who claims the exemption must meet each element for the exemption to apply." *Mohnacky v. FTS Int'l Servs., LLC*, No. 13-CV-246, 2014 WL 4967097, at *3 (W.D. Tex. Oct. 2, 2014). The court must give this exemption "a fair reading." *Carley v. Crest Pumping Techs., L.L.C.*, 890 F.3d 575, 579 (5th Cir. 2018) (quoting *Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1142 (2018)).

When a defendant seeks summary judgment on an affirmative defense like the executive exemption, it "must establish beyond peradventure *all* of the essential elements of the . . . defense to warrant judgment in his favor." *Dewan*, 858 F.3d at 334 (emphasis in original) (quoting *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986)). As the party with the burden of proof on the affirmative defense, the employer "must come forward with evidence which would entitle it to a

directed verdict if the evidence went uncontroverted at trial." *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1264–65 (5th Cir. 1991) (quotation omitted); *see* WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 2727.1 (4th ed. Nov. 2018) ("[I]f the movant bears the burden of proof on a claim at trial, then its burden of production is greater. It must lay out the elements of its claim, citing the facts it believes satisfies those elements, and demonstrating why the record is so one-sided as to rule out the prospect of the nonmovant prevailing."). If the movant has done so, "the burden shifts to the nonmovant to establish an issue of fact that warrants trial." *Dewan*, 858 F.3d at 334 (quotation omitted).

The parties do not dispute that Saunders earned over $455 per week or that he directed at least two other employees. The dispute centers on whether his primary duty was management and the weight given to his employee-status recommendations. According to Lincoln, the record shows that Saunders spent 85 to 90 percent of his time supervising night-shift employees and that his recommendations as to employee status were given significant weight. (Docket Entry No. 16 at 14–20). Saunders responds that there are factual disputes material to making these determinations because the record supports a reasonable inference that Saunders "spent most of his time driving a forklift, loading hoppers, and operating machinery," and that he lacked a "say in hiring, firing, discipline, or such other managerial responsibilities with respect to other employees." (Docket Entry No. 17 at 1–2). The court first considers the record evidence as to whether Saunders's primary duty was management, and then whether he had a say in hiring, firing, and disciplinary decisions.

### A. Saunders's Primary Duty

To be employed in a bona fide executive capacity, an employee's "primary duty" must be "management of the enterprise in which the employee is employed or of a customarily recognized

department or subdivision thereof."  29 C.F.R. § 541.100(2).

Saunders has not disputed that the Magnolia facility's second shift is a "customarily recognized department" with a "permanent status and a continuing function."  29 C.F.R. § 541.103. Production went on "continuously throughout the day" through "two shifts," one during the day and one at night.  (Docket Entry No. 16-1 at 2).  Each shift had a separate Production Supervisor, and the "hourly production workers typically worked on either the first shift or the second shift, but not both."  (*Id.* at 2–3).  The second shift is a customarily recognized department of the Magnolia facility.  *See, e.g.*, *West v. Anne v. Arundel Cty., Md.*, 137 F.3d 752, 763 (5th Cir. 1998) ("A station or a shift constitutes a recognized department or subdivision of the Fire Department.").

Lincoln supports its argument that Saunders's primary duty was management by pointing to evidence that he directed the second-shift operation, decided on vacation and leave requests, trained employees working under him, held regular safety meetings, handled complaints and grievances, recorded production and tracked quotas, reported to the Magnolia Plant Manager, made recommendations on disciplinary actions, controlled the night-shift schedule, and oversaw the machine operation and production process.  (Docket Entry No. 16 at 14–18).  Saunders responds that these and other tasks he performed were the same tasks done by those he supervised, and that he had no say on "discipline, or such other managerial responsibilities."  (Docket Entry No. 17 at 2).

"The term 'primary duty' means the principal, main, major, or most important duty that the employee performs."  29 C.F.R. § 541.700(a).  To determine an employee's primary duty, the court must look to "all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole."  *Id.*  The relevant factors include:

> the relative importance of the exempt duties as compared with other types of duties;
> the amount of time spent performing exempt work; the employee's relative freedom

> from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.

*Id.*; *see also Vela v. City of Hous.*, 276 F.3d 659, 677 (5th Cir. 2001) (stating factors). "[T]he employee's primary duty will usually be what she does that is of principal value to the employer, not the collateral tasks that she may also perform, even if they consume more than half her time." *Dalheim v. KDFW-TV*, 918 F.2d 1220, 1227 (5th Cir. 1990). "Concurrent performance of exempt and nonexempt work does not disqualify an employee from the executive exemption." 29 C.F.R. § 541.106(a). "Employees who do not spend more than 50 percent of their time performing exempt duties may . . . meet the primary duty requirement if the other factors support such a conclusion." *Id.* § 541.700(b). "Generally, exempt executives make the decision regarding when to perform nonexempt duties and remain responsible for the success or failure of business operations under their management while performing the nonexempt work." *Id.* § 541.106(a). "In contrast, the nonexempt employee generally is directed by a supervisor to perform the exempt work or performs the exempt work for defined time periods." *Id.*

> Management activities include:
>
> interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures.

*Id.* § 541.102.

Lincoln hired Saunders to direct night-shift production, with the responsibility to ensure that orders were timely filled, while keeping his employees safe. As the highest ranking employee at the Magnolia facility during the night shift, Saunders set the night-shift schedule; advised and instructed employees on safety, including holding daily safety meetings; and monitored all production activities. Saunders acknowledged that he spent "85 to 90 percent" of his work time "walking around making sure everything was running properly." (Docket Entry No. 16-4 at 23). Saunders also signed off on promotions, raises, leave and vacation requests, and transfers; disciplined employees and reported issues to Chris Ritter or Human Resources; handled employee complaints and grievances, which he relayed to Chris Ritter or to Human Resources in some cases; made sure employees were not "goofing off"; and ensured that "the machines were running" and that his employees "were hitting their quota." (*Id.* at 14, 17). While Saunders forwarded many employee matters to Chris Ritter or Human Resources, the matters went through Saunders and required his decision or recommendation and signature.

The parties have not identified or submitted evidence indicating that Chris Ritter directed Saunders to perform exempt tasks for "defined time periods." 29 C.F.R. § 541.106(a). Saunders's deposition testimony, with other evidence in the record, instead shows that Saunders was free from "direct supervision" during the night shift. *Id.* § 541.700(a); (Docket Entry No. 16-14 at 23).

When Saunders began as a Production Supervisor, the night shift was understaffed. Important work, like forklift operation and maintenance, was neglected. Saunders routinely performed these tasks along with his supervisory responsibilities. Saunders had to meet his production goals and make sure that each order was "processed and ready to go." (Docket Entry No. 16-4 at 17). While Saunders performed these tasks, he understood that his "main job" was "to

supervise" all night-shift production activities and to monitor production "[t]he best [he] could." (*Id.* at 9, 17). After Lincoln hired a forklift driver, Saunders "didn't have to" drive the forklift and "could spend more time on the floor monitoring people trying to improve their productivity." (*Id.* at 26). Saunders made a $60,000 salary when he started; the night-shift employees working under him were paid hourly. (*Id.* at 3).[1]

The undisputed evidence in the record supports a strong inference that Saunders's supervisory duties were the ones "of principal value" to Lincoln. *Dalheim*, 918 F.2d at 1227. The burden shifts to Saunders to establish a factual dispute material as to this issue. Saunders argues that the time he spent performing such nonsupervisory duties as forklift operation and maintenance supports a reasonable inference that his primary duty was not management. (Docket Entry No. 17 at 2). Saunders points to his deposition testimony and the Corona and Henderson declarations as support. (*Id.*). While his deposition and the declarations provide evidence that Saunders regularly performed nonmanagerial tasks, "[c]oncurrent performance of exempt and nonexempt work does not disqualify an employee from the executive exemption." 29 C.F.R. § 541.106(a). The question is what Saunders did that was of "principal value to" Lincoln, "not the collateral tasks that [he] may also perform, even if they consume more than half [his] time." *Dalheim*, 918 F.2d at 1227. Saunders has not submitted or identified evidence creating factual disputes material to determining his principal value to Lincoln. The undisputed record evidence, including Saunders's testimony, shows that his "main job" was "to supervise." (Docket Entry No. 16-4 at 9). In Saunders's words, "I was there to supervise." (*Id.* at 22).

---

[1] Saunders has alleged that the employees working under him made more than him because of overtime pay, but he has not submitted or identified any evidence supporting this allegation. (Docket Entry No. 17 at 2). Lincoln's Human Resources Manager stated that Saunders earned more money than the employees under him. (Docket Entry No. 16-1 at 3).

In their declarations, Corona and Henderson stated that they did not observe Saunders disciplining employees, other than writing up employees for being late or absent. These observations bear on Saunders's use of the disciplinary authority he had, not what other authority he had or how Lincoln used his decisions or recommendations. Their observations do not create a factual dispute material to determining Saunders's primary duty or value to Lincoln. While Corona stated that he did not see Saunders do much "management type work," it is unclear what Corona understood to be "management" work. (Docket Entry No. 17-1). This conclusory statement does not create a genuine factual dispute material to deciding Saunders's primary duty or value.

The court finds and concludes that the record evidence and prevailing case law support a strong inference that Saunders's primary duty was management, one that Saunders has not controverted. *See, e.g.*, *Rainey v. McWane Inc.*, 314 F. App'x 693, 695 (5th Cir. 2009) (production supervisors who spent their time "on the production floor watching, making sure the employees were working safe and doing, putting out good work" were exempt executives under the FLSA (quotation and alteration omitted)); *Williamson v. BOPCO, L.P.*, No. 16-CV-79, 2017 WL 5071336, at *4 (W.D. Tex. Sept. 27, 2017) (a production foreman's primary duty was management because he supervised production and was relatively free from supervision); *Schreckenbach v. Tenaris Coiled Tubes, LLC*, No. 11-CV-4065, 2013 WL 178126, at *6–*7 (S.D. Tex. Jan 16, 2013) (an individual who held night-shift positions as a production supervisor, shift leader, and service coordinator had the primary duty of management).

### B.     Saunders's Influence on Decisions Relating to the Employees on the Night Shift

An executive employee must also have "authority to hire or fire other employees," or the employee's "suggestions and recommendations as to the hiring, firing, advancement, promotion or

any other change of status of other employees" must be "given particular weight." 29 C.F.R. § 541.100(a)(4). The factors relevant to deciding whether an employee's suggestions and recommendations are given "particular weight" include:

> whether it is part of the employee's job duties to make such suggestions and recommendations; the frequency with which such suggestions and recommendations are made or requested; and the frequency with which the employee's suggestions and recommendations are relied upon.

*Id.* § 541.105. "Generally, an executive's suggestions and recommendations must pertain to employees whom the executive customarily and regularly directs." *Id.* "[O]ccasional suggestion with regard to the change in status of a co-worker" is not enough. *Id.*

"[A]n employee's suggestions and recommendations may still be deemed to have 'particular weight' even if a higher level manager's recommendation has more importance and even if the employee does not have authority to make the ultimate decision as to the employee's change in status." *Lovelady v. Allsup's Convenience Stores, Inc.*, 304 F. App'x 301, 306 (5th Cir. 2008) (per curiam) (quoting 29 C.F.R. § 541.105). "If final decision-making authority were the test for determining whether a person was an executive or administrative employee, one would rarely, if ever, qualify as such an employee." *Kastor v. Sam's Wholesale Club*, 131 F. Supp. 2d 862, 867 (N.D. Tex. 2001); *see also Gelhaus v. Wal-Mart Stores, Inc.*, 769 F. Supp. 2d 1071, 1082 (E.D. Tex. 2011).

The record evidence supports an inference that Saunders made suggestions and recommendations as to hiring, firing, and similar employment-status changes for night-shift employees. The list is long. As the night-shift Production Supervisor, Saunders suggested hiring "a couple guys"; recommended firing at least two employees who had not shown up for work; disputed incorrect attendance violations Human Resources issued; approved the night-shift

employees' time cards, sending them to Chris Ritter for final approval; sent employees home if they were disruptive, not medically released, or not doing their jobs; filled out forms for employee vacation and leave requests, giving them to Human Resources for approval; approved employee wage increases, signed evaluations, and informed Chris Ritter of employees' performance on the night shift; issued written citations on employees for being late, using their phones, or making a mistake on a machine; documented and reported workplace accidents; and recommended discipline, including suspensions. (Docket Entry No. 16-4 at 14–15, 17–24; Docket Entry Nos. 16-5–16-6). When Saunders was asked whether he could remember a time that he "made a recommendation to terminate an employee that wasn't followed," Saunders responded "[n]ot that I recall." (Docket Entry No. 16-4 at 24).

While Chris Ritter and Human Resources had the final decisionmaking authority on many employment issues, including hiring and firing, the record evidence does not show an instance in which Lincoln rejected or disagreed with Saunders's actions on time cards, recommendations, approval requests or denials, or disciplinary actions. Saunders testified that he could not recall Lincoln ever declining to follow his recommendations, including on terminating an employee. The undisputed evidence in the record shows that Saunders's recommendations and suggestions as to employee status were given particular weight. *Lovelady*, 304 F. App'x at 306; *see Rainey*, 314 F. App'x at 696; *Schreckenbach*, 2013 WL 178126, at *7–*8 ("Schreckenbach cannot testify as to any occasion when he recommended discipline and his recommendation was not followed."); *Gellhaus*, 769 F. Supp. 2d at 1082 ("[Plaintiff] was tasked with disciplining employees under her supervision by issuing written or verbal warnings, the cumulation of which could result in termination."); *Aguirre v. SBC Comm'cns, Inc.*, No. H-05-3198, 2007 WL 2900577, at *26 (S.D. Tex. Sept 30,

2007) ("The plaintiffs have failed to present or identify evidence controverting SWB's evidence that the plaintiffs offered recommendations and suggestions on employees for whom discipline might be appropriate, including job termination, and that their recommendations and suggestions were given particular weight."); *Williams v. Vynckier Enclosure Sys., Inc.*, No. H-04-3223, 2005 WL 2810709, at *8 (S.D. Tex. Oct. 27 2005) (the employee's recommendations and suggestions were given particular weight, though it was "unclear with what frequency [the employee's] suggestions and recommendations were made and at what frequency they were relied upon"). The burden shifts to Saunders to show a factual dispute material to this issue.

Saunders argues that he had no say "in hiring, firing, discipline, or such other managerial responsibilities with respect to other employees," citing the Corona and Henderson declarations. (Docket Entry No. 17 at 2). Corona stated that he saw Saunders write-up employees for coming in late, leaving early, or not showing for work, "but that was about all the 'discipline' or 'management' type work that [he] ever saw [Saunders] do." (Docket Entry No. 17-1). Corona believed that the "hiring and firing" decisions "were made in [Human Resources]." (*Id.*). Henderson stated that he did not see Saunders "write up or discipline any employees" or become "involved in hiring, firing, or interviewing employees," and that these decisions "appeared to come from the plant manager or owner." (Docket Entry No. 17-2). Because Corona and Henderson only observed Saunders while working under him as machinists, their observations are of scant relevance to determining whether Saunders gave recommendations on employment issues, including hiring and firing, or the weight given to his recommendations. The court has no basis to find that Corona and Henderson had personal knowledge of the weight given to Saunders's recommendations or decisions, and their declarations do not create genuine factual disputes material as to deciding those issues.

In his deposition, Saunders stated that Chris Ritter and Human Resources completed employee evaluations and decided on wage increases. (Docket Entry No. 16-4 at 20–21). Saunders stated that he was not involved in employee evaluations and did not request wage increases for employees. (*Id.*). But Saunders also said that he signed the employee evaluations and that he had to "approve" the wage increases and gave "them to employees." (*Id.* at 17, 20–21). While Saunders himself may not have participated in formal evaluations or prepared the reports, he had to review and sign off, and give them to the employees. (*Id.* at 21). Saunders's statement that he "wasn't involved" in employee evaluations or wage increases, standing alone, does not create a genuine issue material to deciding whether these kind of recommendations were given particular weight. (*Id.*).

Saunders stated that his "main job" at Lincoln was "to supervise." (Docket Entry No. 16-4 at 9). Undisputed record evidence supports or is consistent with that statement. Saunders falls within the FLSA's executive exemption. Based on the current record, the court finds that the evidence as to Saunders's status as an executive employee "rule[s] out the prospect of" Saunders prevailing at trial. WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE § 2727.1. Summary judgment is entered for Lincoln.

## IV. The Conclusion

Lincoln's motion to strike is granted in part and denied in part and summary judgment is granted for Lincoln. (Docket Entry Nos. 16, 18). Final judgment is separately entered.

SIGNED on April 15, 2019, at Houston, Texas.

Lee H. Rosenthal
Chief United States District Judge